[Cite as *Care Circle, L.L.C. v. Ohio Dept. of Mental Health & Addiction Servs.*, 2020-Ohio-1382.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CARE CIRCLE L.L.C.                                  :

    Plaintiff-Appellant,                         :

                                                  No. 108454

v.                                                              :

OHIO DEPARTMENT OF MENTAL              :
HEALTH & ADDICTION SERVS.

                                          :

    Defendant-Appellee.

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 9, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-18-895899

---

### *Appearances:*

Malone Law L.L.C., and John P. Malone, Jr., *for appellant*.

Dave Yost, Ohio Attorney General, and Roger F. Carroll, Principal Assistant Ohio Attorney General, *for appellee*.

MICHELLE J. SHEEHAN, J.:

{¶ 1} Appellant Care Circle, L.L.C. ("appellant") appeals a judgment of the Cuyahoga County Court of Common Pleas affirming an order of Ohio Department of Mental Health and Addiction Services ("MHAS") revoking appellant's licenses

for three adult care facilities licenses ("ACF") pursuant to MHAS's authority under R.C. 5119.34(F)(2)(a) and Ohio Administrative Code ("O.A.C.") 5122-33-05(G). After a review of the record and applicable law, we affirm the judgment of the common pleas court.

Background

{¶ 2} At issue in this case are three adult group homes owned by appellant located at 1864, 1872, and 1878 East 89th Street, Cleveland (referred hereafter as "1864," "1872," and "1878"). An adult group home is a type of ACF. An ACF is a facility licensed by MHAS to provide accommodations, supervision, and personal care services to the elderly or individuals with mental health challenges in a home setting.[1] ACFs are to comply with all applicable laws and ensure that the facilities are in compliance. Once an ACF is granted a license, the license is subject to expiration every two years. During the two-year period, an ACF may be subject to routine inspections in addition to any complaint or mandatory incident report inspections. The inspections may be announced or unannounced. If there is a non-serious noncompliance issue regarding the administrative rules, the facility may be afforded the opportunity for corrections within a specified time; if there is a serious risk to residents' health and safety or a cycle of noncompliance issues regarding the administrative rules, MHAS may propose to deny an application or propose to revoke a license. In 2011, regulatory oversight of ACFs was transferred

---

[1] The term "adult care facility" is no longer used in the Ohio Revised Code, and it is now considered as a type of "residential facilities."

from the Ohio Department of Health to MHAS, which became the state regulatory authority for ACFs.

{¶ 3} The subject ACFs were transferred to appellant in 2009 from another entity. Appellant's application for a renewal of the licenses in 2014 led to the instant appeal.

{¶ 4} On March 14, 2014, MHAS conducted a renewal inspection for the subject ACFs. Ten days later it issued the findings for the homes: all three homes were in disrepair, the bedroom linens and beddings were worn and soiled, special diets for some residents were not provided, and residents' mental health care plans were not completed, among other areas of noncompliance.

{¶ 5} Two of the group homes, 1872 and 1878, were additionally cited for a lack of a dining area in the homes, which forced the residents to walk to 1864 for meals and medications even in inclement weather. In the letter of findings, MHAS required appellant to remedy the situation by providing a dining area with appropriate furniture to allow the residents to eat in their own homes. On April 28, 2014, appellant submitted a plan of correction, stating the dining area was set up, the tables and chairs were ordered, and the homes would be in compliance before June 1, 2014.

{¶ 6} However, on June 23, 2014, appellant requested a variance regarding the food service, claiming that before appellant purchased the group homes in 2009, it was advised that the current setup for the meal service had been approved for 30 years.

{¶ 7} On August 6, 2014, MHAS, in response to the variance request, granted appellant a temporary six-month waiver regarding the requirement for meal service, allowing appellant to add the dining area in 1872 and 1878 by February 6, 2015. In conjunction with the temporary waiver, MHAS renewed appellant's licenses.

{¶ 8} Five weeks after MHAS renewed appellant's licenses, on September 15, 2014, a resident filed a complaint against appellant. Attached to the complaint were pictures showing the homes were in disrepair.

{¶ 9} The next day, on September 16, 2014, MHAS's surveyor Jim Budemlic inspected the homes. He described the homes as in "filthy, deplorable conditions." The problems he observed included broken windows, sagging ceilings, mold in the bathrooms, and bedbug excrement around ripped mattresses.

{¶ 10} Because of the multitude of health and safety issues and the conditions of the homes, on September 22, 2014, MHAS suspended admissions of new residents pending corrective actions taken by appellant.

{¶ 11} On October 15, 2014, a follow-up survey was conducted and MHAS found many of the immediate health and safety concerns had been addressed. On October 16, 2014, appellant submitted a plan of correction specifying how it planned to ensure that the safety and health issues would not occur again in the future. As a result, on October 20, 2014, MHAS lifted the suspension of admissions. On October 29, 2014, MHAS sent a letter advising appellant of the findings from the October 15, 2014 inspection. It listed the violations that had

been corrected and the violations that needed to be addressed in a written plan of correction. MHAS also required evidence of all corrections that were made to be submitted by November 13, 2014.

{¶ 12} On January 14, 2015, MHAS notified appellant that it had not corrected all the problems identified in the plan of correction and again advised appellant that, pursuant to O.A.C. 5122-33-20(F), each ACF must have a kitchen and dining area. MHAS reminded appellant that the temporary waiver previously granted regarding the dining area would expire February 6, 2015.

{¶ 13} On March 6, 2015, MHAS inspected the homes. It found, among other health and safety concerns, the residents in 1872 and 1878 did not have access to water except through the bathrooms.

{¶ 14} Another inspection took place on April 20, 2015, to confirm compliance with the plans of correction issued to appellant on October 29, 2014, and January 14, 2015. The inspection revealed, among other rule violations, there was inadequate food supply; park benches were used as furniture in 1864; and residents in 1872 and 1878 were still required to walk to 1864 for food and medications and obtained drinking water from the bathrooms.

{¶ 15} Based on the April 20, 2015 inspection, MHAS suspended admissions for 1872 and 1878 on June 22, 2015. MHAS identified multiple rule violations, foremost of which was the lack of kitchen and dining areas for the residents in the homes. MHAS required the problems to be remedied by July 6, 2015.

{¶ 16} On July 2, 2015, a conference was held regarding the suspensions for 1872 and 1878. On July 6, 2015, appellant submitted a plan of correction, which stated the following regarding the kitchen and dining area requirement:

> Due to past practices and current practices of several [other] ACFs that are multi-licensed and set up like Care Circle, LLC, we feel that we should be able to continue to serve out of the licensed kitchen [at 1864]. However, Care Circle, LLC, will post notice that the residents have the opportunity to have their meals in their residential building if they so request.

MHAS was satisfied with this proposal, believing that the residents would now be able to eat in their own homes.

{¶ 17} On July 24, 2015, MHAS inspected the homes in response to a complaint from an advocacy agency, Disability Rights Ohio ("DRO").[2] The inspection revealed repair and cleaning issues, as well as health issues such as excessively high temperature. MHAS also found that residents in 1872 and 1878 still could not eat meals in their homes. It requested that appellant provide a reasonable date by which the meal-service requirement would be met.

Revocation of Licenses

{¶ 18} MHAS conducted a final inspection on November 5, 2015, and found persistent unaddressed rule violations, including the lack of a corrective action to address the residents' ability to eat and receive medications in their own homes.

{¶ 19} More than two weeks later, on November 24, 2015, MHAS proposed to revoke appellant's licenses for all three homes. The November 24, 2015 notice

---

[2] DRO is a "legal rights service" organized under the authority of R.C. 5123.601.

enumerated the lack of compliance and advised appellant of its right to request an evidentiary hearing within 30 days.

{¶ 20} Although the November 24, 2015 notice advised of appellant's right to a hearing, appellant did not request a hearing but rather focused on having MHAS approve a plan of correction; on January 11, 2016, while the proposed revocation was pending, appellant submitted a plan of correction without being requested to do so. Regarding the lack of kitchen and dining area in 1872 and 1878, appellant stated that "[k]itchen is up and functioning" and that "[d]ining area is provided."

{¶ 21} To verify appellant's claim of corrective actions, on February 5, 2016, MHAS conducted an additional inspection, which again revealed areas of non-compliance. MHAS conducted two more inspections in 2016: on August 10 and November 14, 2016. Although some issues were remedied, other concerns remained unaddressed and other violations were found. MHAS did not give appellant an opportunity to submit plans of corrections after the August 10, 2016, and November 14, 2016 inspections because the past plans of corrections did not result in compliance.

{¶ 22} On December 2, 2016, MHAS issued a revised notice of proposed revocation, which described appellant's history of rules violations in the homes leading to the November 24, 2015 notice of proposed revocation as well as the findings from the three inspections conducted in 2016 following the November 24, 2015 notice.

The Hearing and the Hearing Examiner's Report and Recommendation

{¶ 23} On January 4, 2017, a status conference was held and the parties agreed to set the matter for a hearing in May 15, 2017. The hearing eventually commenced on August 18, 2017. At the multiple-day hearing, MHAS presented five employees testifying about their observations during their inspections and a representative from DRO regarding the visits made by its representatives and their observations. Appellant presented testimony of its principals, Jeffery and Juahmea Rivers, who testified regarding the improvements they had made to the facilities and corrections made in response to various notices of noncompliance from MHAS.

{¶ 24} After the hearing, the hearing examiner issued a report and recommendation. The hearing examiner tabulated a total of 115 citations of noncompliance between March 14, 2014, and November 14, 2016, for the three homes, 61 of which were repeat citations. For each citation, the hearing examiner listed the O.A.C. sections each citation was based on and referred to the testimony and exhibits presented at the hearing supporting the citation. The hearing examiner noted that, with the exception of the last two inspections (August 10 and November 14, 2016), MHAS had always permitted appellant to submit plans of corrections in response to the citations and, if a proposed plan of correction was deemed unacceptable, MHAS would allow appellant to resubmit additional proposals until the proposed corrections were approved. Furthermore, after a

proposed plan of correction was accepted, MHAS would conduct an inspection to verify the implementation of the proposed corrections.

{¶ 25} The hearing examiner's report also described testimony presented by appellant. Mr. Rivers testified about the improvements totaling $300,000 made to the facilities since their acquisition in 2009. He explained that the living areas were furnished with park benches instead of living room furniture because the residents were destructive to the facilities due to their mental health issues. He maintained that 1872 and 1878 were not required to have a kitchen until after MHAS renewed the licenses in 2014. Mrs. Rivers testified that the temperature was difficult to maintain in the summer because the facilities lacked central air conditioning. She also testified about her involvement in the monitoring of the medication chart during the November 14, 2016 inspection.

{¶ 26} Based on the evidence presented at the hearing, the hearing examiner found all but a few citations to be supported by the evidence.[3] The hearing examiner highlighted the inability of appellant to meet certain basic needs of the residents during the two-and-a-half year period, such as access to clean drinking water and cups, reasonable room temperatures, meals in their own homes, and clean surroundings. Other findings of noncompliance included

---

[3] The three citations found by the hearing examiner to be unsupported by the evidence were (1) citations regarding appellant's failure to provide access to DRO's representatives for an inspection of the three homes on September 24, 2015; (2) citations for 1872 and 1878 regarding improper temperature on July 24, 2015; and (3) a citation regarding 1878 on November 14, 2016, for allowing a resident to keep a swastika on the bedroom wall.

appellant's failure to store food properly, offer meals for special dietary needs, clean mold and mildew in the bathrooms, enforce the nonsmoking policy, provide a home-like, comfortable living area, provide clean linens and bedding in good condition, keep flooring and windows in good repair, maintain adequate staffing for residents' medication needs, repair bathroom fixtures, and perform routine housekeeping and maintenance. The hearing examiner found MHAS had proven 26 findings of noncompliance for 1864; 43 findings for 1872, and 40 findings for 1878.

{¶ 27} Citing R.C. 5119.34(F)(2)(a) and (b), which authorize MHAS to revoke a license of an ACF if the facility is not in compliance with the O.A.C. rules governing ACFs or if the facility has been cited for a pattern of serious noncompliance or repeated violations, the hearing examiner recommended a revocation of appellant's licenses for all three facilities.

{¶ 28} Appellant filed objections to the hearing examiner's report and recommendation. On March 21, 2018, the Director of MHAS approved the findings of fact, conclusions of law, and recommendations of the hearing examiner. Effective April 15, 2018, MHAS revoked appellant's three adult group home licenses.

Appeal

{¶ 29} Appellant appealed the adjudication order to the Cuyahoga County Court of Common Pleas pursuant to R.C. 119.12. The common pleas court affirmed the adjudication order revoking appellant's licenses, finding the order was

"supported by reliable, probative and substantial evidence and is in accordance with law."

{¶ 30} On appeal, appellant raises ten assignments of error. They state:

I.      ODMHAS licensed Care Circle for the period from 2014 through 2016, and it was a mistake of law and violation of due process for ODMHAS to repudiate its approval and licensing of the facilities.

II.     There is clear error of law and a denial of procedural due process because the hearing examiner incorrectly determined that the ninety day time limitation for bringing a hearing on the suspensions of admission did not apply.

III.    ODMHAS erred as a matter of law by failing to bring the suspensions of admission and the revocations to a hearing within a reasonable time and within the time limits required by the Ohio statutory and regulatory framework.

IV.    The statute section cited as authority for suspensions of admission for 1872 and 1878 does not pertain to the facts in this matter, does not give adequate due process notice and the regulations upon which the order was based were void.

V.     Each of the properties had a separate license for which Care Circle requested and had a right to a separate hearing on each suspension of admission and on each revocation, and it was a prejudicial error of law by ODMHAS to postpone all the hearings and join them into one proceeding.

VI.    ODMHAS erred as a matter of law in carrying out its administrative duties and thus denied Care Circle's procedural due process rights.

VII.   ODMHAS erred as a matter of law because there was disparate treatment of Care Circle in the inspection and validation process and the revocations violated Care Circle's due process rights.

VIII.  The evidence presented by Disability Rights Ohio should not have been admitted into the record because it arose from

general investigative searches beyond the scope authorized by the Protection and Advocacy for Individuals With Mental Illness Act ("PAIMI"). 42 U.S.C. Section 10801 et seq. and Care Circle was thereby denied constitutional and procedural due process.

IX. It was a mistake of law for ODMHAS to require and for the hearing examiner to approve violations for failure to have homelike furniture and homelike kitchens because the regulations do not contain such requirements.

X. The revocations are contrary to law in that they are based on findings reflecting personal opinions of department personnel and not on objective standards.

Standard of Review

{¶ 31} In an R.C. 119.12 administrative appeal, the common pleas court must affirm the agency's decision if it is supported by "reliable, probative, and substantial evidence and is in accordance with law." R.C. 119.12(M); *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621, 614 N.E.2d 748 (1993). Furthermore, the evidence required by R.C. 119.12 can be defined as follows:

> "Reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. (3) "Substantial" evidence is evidence with some weight; it must have importance and value.

*Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571, 589 N.E.2d 1303 (1992).

{¶ 32} This review by the common pleas court is "neither a trial de novo nor an appeal on questions of law only, but a hybrid review in which the court 'must appraise all the evidence as to the credibility of the witnesses, the probative

character of the evidence, and the weight thereof.'" *Lies v. Ohio Veterinary Med. Bd.*, 2 Ohio App.3d 204, 207, 441 N.E.2d 584 (1st Dist.1981), quoting *Andrews v. Bd. of Liquor Control*, 164 Ohio St. 275, 280, 131 N.E.2d 390 (1955). The trial court must give due deference to the administrative resolution of evidentiary conflicts, although the findings of the agency are by no means conclusive. *Gallagher v. Ross Cty. Sheriff*, 10th Dist. Franklin No. 06AP-942, 2007-Ohio-847, ¶ 14, citing *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 111, 407 N.E.2d 1265 (1980).

{¶ 33}In contrast to the common pleas court's standard of review, our review of an administrative agency's order is more limited. While an appellate court has plenary review of purely legal questions, *Big Bob's, Inc. v. Ohio Liquor Control Comm.*, 151 Ohio App.3d 498, 2003-Ohio-418, 784 N.E.2d 753, ¶ 15 (10th Dist.), we do not engage in weighing of the evidence.

> While it is incumbent on a common pleas court to examine the evidence, this is not a function of the appellate court. The appellate court is to determine only if the trial court has abused its discretion, i.e., being not merely an error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency * * *. Absent an abuse of discretion on the part of the trial court, a court of appeals may not substitute its judgment for [that of an administrative agency] or a trial court. Instead, the appellate court must affirm the trial court's judgment.

*Pons* at 621.

Statutory Authority of MHAS

{¶ 34} Several statutes and O.A.C. sections are pertinent to this case. R.C. 5119.34(H) governs when an inspection may be conducted and MHAS's duty following the inspection. It provides, in relevant part:

(H)(1) The department of mental health and addiction services *may* conduct an inspection of a residential facility as follows:

(a) Prior to issuance of a license for the facility;

(b) Prior to renewal of the license;

(c) To determine whether the facility has completed a plan of correction required pursuant to division (H)(2) of this section and corrected deficiencies to the satisfaction of the department and in compliance with this section and rules adopted pursuant to it;

(d) Upon complaint by any individual or agency;

(e) *At any time the director considers an inspection to be necessary in order to determine whether the facility is in compliance* with this section and rules adopted pursuant to this section.

(2) * * * *Following each inspection and review, the department shall complete a report listing any deficiencies, and including, when appropriate, a time table within which the operator shall correct the deficiencies. The department may require the operator to submit a plan of correction describing how the deficiencies will be corrected.*

(Emphasis added.) R.C. 5119.34(F) governs the consequences of noncompliance.

It provides, in relevant part:

(F)(1) The department of mental health and addiction services shall inspect and license the operation of residential facilities. The department shall consider the past record of the facility and the applicant or licensee in arriving at its licensure decision. The department may issue full, probationary, and interim licenses. A full license shall expire up to three years after the date of issuance, a probationary license shall expire in a shorter period of time as specified in rules adopted by the director of mental health and addiction services under division (L) of this section, and an interim license shall expire ninety days after the date of issuance. A license may be renewed in accordance with rules adopted by the director under division (L) of this section. * * *

(2) The department may issue an order suspending the admission of residents to the facility or refuse to issue or renew and *may revoke* a license if it finds any of the following:

(a) The facility is not in compliance with rules adopted by the director pursuant to division (L) of this section;

(b) Any facility operated by the applicant or licensee *has been cited for a pattern of serious noncompliance or repeated violations*

*of statutes or rules* during the period of current or previous licenses[.]

(Emphasis added.)

{¶ 35} Several O.A.C. sections promulgated under R.C. 5119.34 are also pertinent here.[4] O.A.C. 5122-33-05(G)(1) and (G)(2) state:

(G) If any adult care facility fails to comply with any requirement of Chapter 5119 of the Revised Code or with any rule of this chapter or 5122-33-28 of the Administrative Code, the director *may do any one or all of the following*:
(1) In accordance with Chapter 119 of the Revised Code, deny, revoke, or refuse to renew the license of the facility;
(2) Give the facility an opportunity to correct the violation, in accordance with section 5119.34 of the Revised Code[.]

(Emphasis added.)

Analysis

{¶ 36} Pursuant to R.C. 5119.34(F)(2)(a), MHAS may issue an order suspending the admission of residents to an ACF or refuse to renew or revoke an ACF's license if it finds that the facility is not in compliance with the rules adopted by the director of MHAS.

{¶ 37} Appellant presents ten assignments of error for our review and raises an assortment of claims under many of the assignments of error. Although the claims asserted under the assignments of error are often repetitive and duplicative, we discuss each assignment of error in turn for ease of disposition. Furthermore, we note that appellant raises several issues for the first time on

---

[4] O.A.C. Chapter 5122-33, which governs ACFs, was rescinded effective January 1, 2018. ACFs, now considered a subcategory of residential facilities, are now governed by O.A.C. Chapter 5122.30, which contain all residential facilities rules.

appeal. A basic tenant of appellate jurisdiction is that a party may not present an argument on appeal that was not raised below. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997). The waiver doctrine applies equally to an administrative appeal. *State ex rel. Schlegel v. Stykemain Pontiac Buick GMC, Ltd.*, 120 Ohio St.3d 43, 2008-Ohio-5303, 896 N.E.2d 143, ¶ 17 ("a party's failure to raise an issue at the administrative level precludes the party from raising it before a reviewing court"). Therefore, we will summarily dispose of the claims not raised at the administrative level because they are not properly presented for review before this court.

First Assignment of Error

{¶ 38} Appellant's first assignment of error concerns MHAS's finding on noncompliance regarding the lack of kitchen and dining area in 1872 and 1878. It argues that MHAS approved the existing arrangement for meal provisions when it renewed appellant's licenses in 2014 and therefore its subsequent finding of noncompliance constituted repudiation of its prior approval. Appellant also argues that, even if its practice was considered a violation of the rules, the noncompliance had been remedied by (1) the posting of signs advising the residents in 1872 and 1878 that they could eat in their homes upon request, and (2) appellant's eventual installation of kitchens in 1872 and 1878, although the kitchens remained locked and only available upon request.

{¶ 39} As the record reflects, MHAS repeatedly raised the issue of a lack of dining areas before it renewed the licenses in 2014 and only granted a temporary

waiver when it renewed the licenses. In a letter dated August 6, 2014, MHAS advised appellant that its research did not reveal any prior waiver regarding the requirement of O.A.C. 5122-33-22(C) for a dining area where meals are served to residents, and that a temporary six-month waiver regarding this requirement was granted through February 6, 2015. Even if, for argument's sake, appellant's past practice was approved at some point, appellant is mistaken in claiming that MHAS should be estopped from enforcing the rule because estoppel does not apply against the state's agencies in the exercise of a governmental function. *Sekerak v. Fairhill Mental Health Ctr.*, 25 Ohio St.3d 38, 39, 495 N.E.2d 14 (1986).

{¶ 40} Regarding the remedial measures taken by appellant, while MHAS originally accepted appellant's proposal for posting signs in the facilities advising the residents they could have meals served in their own homes, MHAS subsequently learned during its inspections that the signs did not achieve the goal of enabling the residents to eat meals in their homes. Furthermore, while appellant eventually installed kitchens in 1872 and 1878, they were locked and unavailable to the residents. For these reasons, the first assignment of error lacks merit.

Second and Third Assignments of Error

{¶ 41} Under both the second and third assignments of error, appellant argues the suspensions of admissions for the three facilities (on July 7, 2015, for 1872 and 1878 and on December 15, 2015, for 1864) were not brought to a hearing within 90 days pursuant to O.A.C. 5122-33-27(D). Appellant argues the

suspensions should have been terminated "by operation of law" when the hearing did not take place within 90 days.

{¶ 42} Appellant never advanced this claim at the administrative level. "[A] party's failure to raise an issue at the administrative level precludes the party from raising it before a reviewing court." *State ex rel. Schlegel*, 120 Ohio St.3d 43, 2008-Ohio-5303, 896 N.E.2d 143, ¶ 17.[5]

{¶ 43} Under the third assignment of error, appellant also claims that MHAS unreasonably delayed the hearing for the license revocations. The record reflects that MHAS issued the first notice to revoke the licenses for the three facilities on November 24, 2015. MHAS conducted three additional surveys in

---

[5] O.A.C. 5122-33-37 provides that the director of MHAS shall give a written notice of the order of suspension and allow the facility to request a conference on the order of suspension. Furthermore, O.A.C. 5122-33-37(D) provides:

> At the conference the director shall discuss with the representatives of the facility the violation cited in the notice provided for in paragraph (B) of this rule and shall advise the representatives in regard to correcting the violations. Not later than five days after the conference, the director shall issue another order either upholding or terminating the suspension. *If the director issues an order upholding the suspension, the facility may request an adjudication hearing pursuant to Chapter 119. of the Revised Code, but the notice and hearing under that chapter shall be provided after the order is issued, and the suspension shall remain in effect during the hearing process unless terminated by the director or until ninety days have elapsed after a timely request for an adjudication hearing is received by the director, whichever is sooner.*

(Emphasis added.)

Pursuant to O.A.C. 5122-33-37(D), therefore, even if the issue were not waived, we find appellant's claim without merit because appellant did not make a timely request for an adjudication hearing with respect to the suspension order.

2016 and worked with appellant to bring the facilities into compliance. No hearing was requested by appellant. After MHAS issued revised notices of revocation on December 2, 2016, a hearing was scheduled for May 15, 2017, by agreement of the parties, which was continued to August 18, 2017, also by agreement of the parties. Appellant raises the claim regarding the timing of the revocation hearing for the first time on appeal and therefore the claim is waived. For the foregoing reasons, the second and third assignments of error are overruled.

Fourth Assignment of Error

{¶ 44} Under the fourth assignment of error, appellant argues MHAS cited the wrong statute for MHAS's authority for suspension of admissions for 1872 and 1878 in its June 22, 2015 "Suspension of Admissions Notice."

{¶ 45} R.C. 5119.34(F)(2) authorizes MHAS to issue an order suspending the admission of residents if it finds "(a) [t]he facility is not in compliance with rules adopted by the director * * * [or] (b) [a]ny facility operated by the applicant or licensee has been cited for a pattern of serious noncompliance or repeated violations of statutes or rule*s* during the period of current or previous licenses[.]" There appears to be a typographical error in MHAS's suspension notice — the notice cites R.C. 5119.34(*E*)(2), rather than R.C. 5119.34(*F*)(2). While appellant is correct that R.C. 5119.34(E)(2), which addresses the issue of reapplication after a license has been revoked, is not the appropriate statutory authority for suspension of admissions, appellant raises this issue for the first time on appeal. It claims that the erroneous citation to the statutory authority did not give it adequate notice.

{¶ 46} Appellant's claim is waived. Furthermore, the claim of a lack of notice appears to be disingenuous. MHAS's notice was clearly labeled as "Suspension of Admission Notice" and it enumerated various findings of rule violations leading to the suspension. Despite the typographical error, there is no doubt Care Circle knew MHAS was suspending the admission of residents for 1872 and 1878. Even if the claim had not been waived, it lacks merit. *See, e.g., Mason v. Rischar*, 12th Dist. Warren No. CA94-08-072, 1995 Ohio App. LEXIS 3411 (Aug. 21, 1995), fn.1 (although the officer listed the wrong section number in a traffic citation, such an error was not fatal or prejudicial where the citation contained a correct description of the offense, appellant was aware of the nature of the charge, and appellant at no time objected to the defect in the citation). The fourth assignment of error is without merit.

Fifth Assignment of Error

{¶ 47} Under the fifth assignment of error, appellant argues it was entitled to a separate hearing on the suspension and revocation of each of the three facilities, claiming the combined hearing was prejudicial because the number of violations cited by the hearing examiner was multiplied and therefore misleading. The record indicates appellant never requested separate hearings and raises the claim for the first time on appeal. We also note that the hearing examiner's report meticulously tabulated the findings of violations for each facility instead of commingling the findings. In any event, R.C. 5119.34(F)(2)(b) provides that MHAS may suspend admissions or revoke a license if "*[a]ny facility operated by*

*the applicant or licensee* has been cited for a pattern of serious noncompliance or repeated violations of statutes or rules during the period of current or previous licenses[.]" (Emphasis added.) As the statute on its face permits citations regarding other facilities owned by the same licensee to be used as a basis of suspension, nonrenewal, or revocation, appellant's claim of prejudice lacks merit even if it had not been waived. The fifth assignment of error is overruled.

Sixth Assignment of Error and Eighth Assignments of Error

{¶ 48} The sixth and eighth assignments of error overlap in part, and we address them together. Under the sixth assignment of error, appellant claims MHAS failed to carry out its administrative duties in (1) failing to terminate the suspensions of admission after the violations were corrected, (2) failing to provide guidance to appellant as required by O.A.C. 5122-33-27, and (3) accepting and relying on investigative reports provided by DRO.

{¶ 49} Regarding the first claim, O.A.C. 5122-33-05(H) authorizes the MHAS to revoke a license, give the facility an opportunity to correct the violation, suspend the admission of residents, impose a civil penalty, or seek injunctive relief in the common pleas court. The record shows appellant was afforded opportunities over a period of more than two years to take corrective actions; while some problems were remedied, new violations would occur.

{¶ 50} Regarding the second claim, appellant, citing O.A.C. 5122-33-27(C), claims MHAS did not provide guidance as to how to fix the violations. O.A.C. 5122-33-27(C) states that the notice of suspension of admission shall contain the

following: (1) a description of the violation; (2) a citation of the statute or rule violated; (3) a description of the corrections required for termination of the order of suspension; and (4) procedures for the facility to follow to request a conference on the order of suspension. Our review of the suspension notices sent to appellant shows that MHAS described the corrective actions to be taken by appellant for each rule violation. The claim is not supported by the record.

{¶ 51} The third claim under the sixth assignment of error and the eighth assignment of error both relate to the DRO, and we address them together.

{¶ 52} Under the sixth assignment of error, appellant makes the broad assertion that the DRO representatives did not follow the proper guidelines and procedures for the inspections of their facilities.

{¶ 53} We note that DRO is a "legal rights service" organized under the authority of R.C. 5123.601. As observed by the hearing examiner, pursuant to O.A.C. 5122-33-06(B)(5), employees of such an organization may enter an ACF at any time for an inspection. Appellant fails to point to pertinent portions of the record to substantiate its claim. Appellant alleges "[t]here is no evidence in the record that DRO employees followed the guidelines and procedures set forth [in] ORC 5119.39." R.C. 5119.39 (now renumbered as R.C. 5119.43), however, governs licenses to maintain methadone treatment and it is unclear what statutory section appellant intends to cite as authority. All three claims under the sixth assignment are without merit.

{¶ 54} Under the eighth assignment of error, appellant argues that the evidence presented by DRO, including the testimony of Katherine Yoder, an advocate from DRO, regarding the visits and observations made by DRO's representatives during their inspections of the facilities, should be struck from the record because it was the result of "investigative searches" beyond the scope of the investigation authorized by a federal statute, the Protection and Advocacy for Individuals with Mental Illness Act.

{¶ 55} In particular, appellant complains that the "searches" conducted by DRO were beyond its authority because DRO refused to reveal the identity of the resident who may have complained to DRO about the conditions of the facility. This is the first time appellant raises the claim. In addition, the two federal cases cited by appellant as authority do not support appellant's claim that DRO cannot inspect its facilities without disclosing the name of a complainant.[6] The eighth assignment of error lacks merit.

Seventh Assignment of Error

{¶ 56} Under the seventh assignment of error, appellant raises seven claims, arguing appellant received disparate treatment.

---

[6] Appellant cites *Disability Law Ctr. v. Discovery Academy*, D.Utah No. 2:07-cv-755 CW, 2010 U.S. Dist. LEXIS 410 (Jan. 5, 2010) and *Ohio Legal Rights Serv. v. Buckeye Ranch, Inc.*, 365 F.Supp.2d 877 (S.D.Ohio 2005) The former concerned an advocacy agency's investigation of an alleged abuse of an individual with mental illness under the authority of the Protection and Advocacy for Individuals with Mental Illness Act, and the latter concerned an advocacy group's claim for access to records of a residential facility for children with mental illness. Our review of these cases shows neither case is pertinent to appellant's claim.

{¶ 57} Appellant's first claim concerns the testimony of MHAS's representative Jim Budemlic, who testified that he went to appellant's facilities on three occasions in 2016 but was not instructed by his supervisor to make subsequent visits to the facilities to verify if the violations had been corrected. Citing this testimony, appellant claims that MHAS failed to perform the necessary verification visits after the inspections because subsequent inspections could have revealed exculpatory evidence. Appellant claims MHAS treated appellant in a disparate manner without performing subsequent inspections after violations were found in the 2016 inspections.

{¶ 58} While the record reflects that appellant was not provided an opportunity to submit a plan of correction in response to the August 10, 2016 and November 14, 2016 inspections and MHAS did not perform any further inspections after November 14, 2016, before issuing the initial notice of revocation on December 2, 2017, the hearing examiner found that MHAS was *not* required to offer appellant an opportunity to correct the deficiencies revealed in these inspections.

{¶ 59} R.C. 5119.34(H)(1) states that MHAS "may conduct an inspection of a residential facility * * * (e) *[a]t any time the director considers an inspection to be necessary in order to determine whether the facility is in compliance* with this section and rules adopted pursuant to this section." (Emphasis added.) Under the rule, MHAS could choose to either initiate revocation proceedings or offer another opportunity for appellant to submit a plan of correction. In this case, because

appellant had repeatedly failed to comply with the rules, MHAS was justified in considering another inspection unnecessary in order to determine appellant's compliance and acted within its discretion to initiate revocation proceedings pursuant to R.C. 5119.34(H)(1).

{¶ 60} Second, appellant claims that *after* issuing the notice of revocation on December 2, 2016, MHAS should have performed another inspection to determine if appellant was in compliance. Nothing in the statutes or rules requires MHAS to continue to inspect a facility after a revocation proceeding is commenced.

{¶ 61} Third, appellant claims MHAS misinterpreted the law in requiring the residents to have "total access to the kitchens." O.A.C. 5122-33-20(B) states that "[e]ach ACF shall provide dietary services that meet at least the following standards: Each day, the facility shall make available at least three balanced, nourishing and appetizing meals to all residents." O.A.C. 5122-33-20(F) states that "[e]ach ACF shall have a kitchen, equipment and facilities that are appropriate and adequate for preparing and serving meals to residents[.]" O.A.C. 5122-33-20(G) states "[e]ach ACF shall have procedures in place that assure the kitchen area and dining area(s) are cleaned after each meal[s.]" MHAS interpreted the rules as requiring appellant to have a kitchen and a dining area in each facility. We find this to be a reasonable interpretation of the rules. *Swallow v. Indus. Comm. of Ohio*, 36 Ohio St.3d 55, 57, 521 N.E.2d 778 (1988) (courts, when interpreting

statutes, must give due deference to an administrative interpretation formulated by an agency).

{¶ 62} Fourth, appellant claims MHAS did not provide all relevant evidence at the hearing; in particular, it failed to provide Jim Budemlic's handwritten notes taken during his inspections. Our review of Budemlic's testimony shows he testified that he would scribble some notes when he inspected a facility and, after the visit, he would go through the process of putting a findings letter together and then put his handwritten notes in a shredder. Appellant claims it was denied the opportunity to obtain exculpatory evidence from these notes. There is no requirement that the MHAS representative must retain his or her personal notes. Budemlic testified his notes were incorporated into the letter of findings and, furthermore, he was subject to cross-examination by appellant regarding his findings of violations. Appellant's claim lacks merit.

{¶ 63} Fifth, appellant claims MHAS should have provided appellant its findings from the August 10 and November 14, 2016 inspections and its failure to do so deprived appellant the opportunity to correct the deficiencies. The record reflects that the findings of rule violations were provided in the December 2, 2016 revised notices of proposed revocation and therefore appellant had notice of the findings upon which MHAS based the revocations. Furthermore, under O.A.C. 5122-33-05(G), MHAS may revoke a license instead of offering an opportunity to correct the violations. MHAS's action was reasonable, given appellant's history of persistent rule violations.

**{¶ 64}** The last two claims under the seventh assignments of error concern the lack of kitchens in 1872 and 1878.  Appellant alleges that at the conference on July 2, 2015, it was allowed to remedy the lack of kitchens in 1872 and 1878 by posting signs advising residents that they could request their meals in their own homes, but MHAS later improperly withdrew its "approval."  Appellant also alleges MHAS treated appellant in a disparate manner, citing a MHAS employee's testimony that reflected that another ACF (not owned by appellant) was allowed to post signs to remedy the problem of lacking a kitchen in some of the facilities.

**{¶ 65}** The hearing examiner found that, while the signs were proposed and MHAS approved of this proposal, subsequent interviews with the residents showed that they were unaware of the signs.  Because the signs did not achieve the goal of providing meal service to the residents in their homes, it was not unreasonable for MHAS to cite appellant subsequently for noncompliance regarding meal service, even though it initially agreed to have appellant remedy the problem by way of posting signs.

**{¶ 66}** Regarding the other ACF licensee referenced in the testimony of a MHAS employee, our review of the testimony shows that the other licensee referred to by the employee had multiple facilities and, in two of the facilities, the signs were posted giving the residents the option of having meals in their homes instead of walking over to another facility.  The MHAS employee, however, explained that the two cases were different because the residents in the other case had access to a phone and could call to express their wish about where they would

have their meals.  Therefore, the testimony does not reflect disparate treatment as appellant alleges.  For the foregoing reasons, the seventh assignment of error is overruled.

Ninth Assignment of Error

{¶ 67} The ninth assignment of error concerns the hearing examiner's finding of fact that appellant failed to "provide a home-like setting that is comfortable, safe and functional."  Appellant argues there is no rule requiring the premises be "home-like."  Appellant specifically argues there is no requirement for "home-like" furniture.

{¶ 68} O.A.C. 5122-33-22 (G) states: "[e]ach facility shall assure a safe, clean, healthy environment by doing at least the following: * * * (5) [e]stablishing and implementing housekeeping and maintenance procedures to assure a clean, safe, sanitary environment and a home-like appearance to the facility."

{¶ 69} The hearing examiner found that appellant failed to provide "a home-like setting that is comfortable, safe, and functional as well as healthy, and decent, that includes social, recreational leisure activities."  For this finding, the hearing examiner pointed to the park bench style seating in the common seating area, a lack of drinking cups at all times, a lack of accessibility to the kitchen at all times, the absence of recreational activities in the home such as games, books, group activities, and the lack of routine cleaning and repairmen for the bathroom. Thus, even if a literal reading of the rule does not mandate home-like furniture, the rule does require appellant to assure a "healthy" environment by "at least"

"establishing and implementing housekeeping and maintenance procedures * * * to assure a home-like appearance to the facility." Even if home-like furniture is not required under a literal reading of the rule, the hearing examiner's finding of deficiencies regarding the lack of drinking cups and unclean bathrooms were properly made under the rule. The ninth assignment of error lacks merit.

Tenth Assignment of Error

{¶ 70} Under the tenth assignment of error, appellant argues the revocations were contrary to law because they were predicated on the hearing examiner's findings based not on objective standards but on the hearing examiner's arbitrary and personal opinions. Appellant challenges almost all of the hearing examiner's findings of deficiencies, including (1) appellant's lack of enforcement of nonsmoking, (2) improper temperature control, (3) lack of kitchen and home-like environment, (4) lack of proper monitoring of resident medications, (5) lack of drinking water, and (6) lack of maintenance. Our review of the hearing examiner's report shows that the hearing examiner gave reasons why appellant was not in compliance regarding these deficiencies. Appellant's mere disagreement with the findings cannot support its claim that the findings are arbitrary and subjective. The tenth assignment of error lacks merit.

{¶ 71} After a review of the record, we are unable to conclude that the trial court abused its discretion in determining that MHAS's revocation of appellant's licenses was supported by reliable, probative, and substantial evidence. The trial court's judgment is affirmed.

{¶ 72} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, JUDGE

ANITA LASTER MAYS, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR